IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

**LORI ANN KEATON,**

    **Plaintiff,**

**v.**            **Case No.: 1:20-cv-00855**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 15, 16).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion be **GRANTED** to the extent that it requests remand of the Commissioner's decision, (ECF No. 15); the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF

No. 16); the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In November 2017, Plaintiff Lori Ann Keaton ("Claimant") protectively filed for DIB, alleging a disability onset date of June 23, 2017 due to "generalized anxiety disorder, major depression/bipolar II, obsessive/compulsive personality, lack of concentration, indecisiveness, low self esteem, repeatedly going over thoughts, agitation, trigger fingers in both hands, and hypothyroidism." (Tr. at 15, 205, 235). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 15). Claimant subsequently filed a request for an administrative hearing, which was held on January 22, 2020 before the Honorable Marc Silverman, Administrative Law Judge (the "ALJ"). (Tr. at 37-63). On February 4, 2020, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-35). The ALJ's decision became the final decision of the Commissioner on November 6, 2020 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14). Thereafter, Claimant filed a Brief in Support of Complaint and Motion for Judgment on the Pleadings, (ECF No. 15), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 16), to which Claimant replied, (ECF No. 17). Consequently, the matter is fully briefed and ready for resolution.

## II.   __Claimant's Background__

Claimant was 51 years old on her alleged disability onset date and 54 years old on the date of the ALJ's decision. (Tr. at 28). She attended college, communicates in English, and previously worked as an automobile contract clerk, court clerk, and cashier and dining room attendant in a college cafeteria. (Tr. at 57-58, 234, 236).

## III.   __Summary of the ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

　　When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting

with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through September 30, 2022. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since her alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: depression, anxiety disorder, obsessive compulsive personality disorder, and avoidance personality disorder. (*Id.*, Finding No. 3). The ALJ also considered Claimant's back disorders, hypothyroidism, hyperlipidemia,

gastroesophageal reflux disease, and status post third and fourth trigger finger release, but the ALJ found that the impairments were non-severe. (Tr. at 17-19).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform simple, routine tasks; can make simple work-related decisions; no more than occasional interaction with supervisors, co-workers, and the general public; and low stress work, which is defined as routine work with no more than occasional changes in the work.

(Tr. at 21-28, Finding No. 5).

At the fourth step, the ALJ found that Claimant could not perform her past relevant work. (Tr. at 28, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 28-30, Findings 7 through 10). The ALJ considered that Claimant (1) was born in 1966 and defined as a person closely approaching advanced age on her alleged disability onset date; (2) had at least a high school education and could communicate in English; and (3) had no transferable job skills. (Tr. at 28-29, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ concluded that Claimant could perform other jobs that existed in significant numbers in the national economy, such as a garment sorter, bus cleaner, and laundry worker. (Tr. at 29-30, Finding No. 10). Consequently, the ALJ determined that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 30, Finding No. 11).

**IV.**    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the ALJ's decision, claiming that the ALJ did not (1) address the issue of absenteeism for mental health treatment and (2) properly evaluate the opinions of Claimant's treating mental health providers. (ECF No. 15 at 4-16). In response to Claimant's challenges, the Commissioner argues that Claimant's regularly scheduled appointments could be planned to accommodate her work schedule, and they would not inherently result in excessive absenteeism. (ECF No. 16 at 12). Further, the Commissioner contends that the ALJ properly evaluated the opinion evidence under the revised regulatory framework. (*Id*.). Claimant filed a reply to the Commissioner's brief. She notes that the ALJ did not articulate any analysis regarding absenteeism, and the Commissioner simply provided *post hoc* rationale that the appointments could be scheduled to accommodate Claimant's job. (ECF No. 17 at 2). Claimant also argues that it is specious that the ALJ devoted two pages of the decision to Claimant's severe mental symptoms, yet he cherrypicked facts that Claimant had normal appearance and was engaged during her counseling sessions to conclude that the treating opinions were not persuasive. (*Id*. at 9).

**V.**    **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The evidence that is most relevant to the instant matter is summarized as follows.

***A. Treatment Records***

Claimant was admitted to the behavioral unit at Princeton Community Hospital on June 12, 2016 due to severe depression, agitation, difficulty concentrating, and vague suicidal thoughts. (Tr. at 319). She was diagnosed with major depressive disorder, generalized anxiety disorder, and possible bi-polar disorder and discharged for outpatient

treatment after two and one-half days. (*Id.*). On February 6, 2017, Claimant presented as a new patient to psychologist John C. Terry, M.S. Mr. Terry diagnosed Claimant with sadness, anxiety, panic disorder, social anxiety and/or phobias, and personality disorder. (Tr. at 398). He recommended cognitive behavioral therapy and education. (Tr. at 399). Claimant presented for her first counseling session with Mr. Terry on February 20, 2017. She exhibited normal speech and appearance and unimpaired thought content, but she seemed generally uncomfortable and distressed with impaired memory, decreased cognitive functioning; and abnormal behavior, attitude, mood, affect, and thought processes. (Tr. at 401-02).

On March 6, 2017, Mr. Terry noted that Claimant was improved. (Tr. at 405). She was smiling much more readily and did not appear to be in despair. (*Id.*). Her thought processes remained tangential and superficial, but she did not reflect any sense of hopelessness or helplessness. (*Id.*). Claimant agreed with Mr. Terry's treatment plan to continue her current medication and therapy. (*Id.*). Mr. Terry noted on March 13, 2017 that Claimant's affect was much brighter, and she was improved from her previous visit. (Tr. at 407). Her cognitive functioning, appearance, and behavior were unimpaired, although she was distressed with impaired judgment and insight, guarded attitude, and abnormal mood and affect. (Tr. at 406-07).

On March 20, 2017, Mr. Terry discussed increasing Claimant's dosage of Zoloft because she frequently woke up at night, had racing thoughts, and was prone to depressive drops and laborious decision making. (Tr. at 410). Her speech, appearance, and behavior were unimpaired, but all of her other psychiatric findings were abnormal. (Tr. at 409). On March 27, 2017, Mr. Terry noted that Claimant was slightly improved (Tr. at 412). However, on April 5 and May 1, 2017, respectively, Mr. Terry recorded that

Claimant was anxious and marginally coping with work stress. (Tr. at 414, 417). He opined that Claimant was "virtually disabled by her anxiety." (*Id.*). Claimant was prescribed Zoloft, Buspar, and Klonopin. (*Id.*).

Claimant was doing a little better on May 10, 2017 because she was on summer break from her job and trying to take advantage of the time to herself. (Tr. at 420). However, six days later, Mr. Terry noted that Claimant was doing nothing to help her psychiatric "situation" and seemed to require more medication management, so he was referring her to Staci Craft, PA-C. (Tr. at 423). On May 23, 2017, Claimant noted that her primary care provider advised her to take Buspar regularly, and it already helped. (Tr. at 426). Claimant was the calmest and most focused that she had been in counseling, more functional at home, and enjoyed a few activities. (*Id.*). Yet, on June 6, 2017, Claimant was more anxious and tearful and angry after returning to work. (Tr. at 429). Mr. Terry also recorded on June 20, 2017 that Claimant was noticeably deteriorated and anxious after returning to work, and her mood was helpless and depressed. (Tr. at 432). Mr. Terry opined that "disability might be in her future." (*Id.*).

On June 23, 2017, Claimant underwent an intake evaluation at Southern Highlands Community Mental Health Center ("Southern Highlands"). She reported increased anxiety and depression, stating that her job at Concord University was causing her stress and was an "unpleasant work environment." (Tr. at 365). PA-C Craft performed a psychiatric evaluation of Claimant at Southern Highlands on June 30, 2017. Claimant was agitated, anxious, and hyperverbal, and she complained of racing thoughts, but she maintained good eye contact and was well groomed, neatly dressed, in no acute distress, alert, logical, fully oriented, pleasant, and cooperative. (Tr. at 374). Her memory was intact, attention and insight/judgment were fair, and her intelligence was average. (*Id.*).

PA-C Craft diagnosed Claimant with unspecified bipolar and related disorders and generalized anxiety disorder. (*Id.*). She prescribed Zoloft, Lithium, and Klonopin. (Tr. at 375).

On July 6, 2017, Claimant told Mr. Terry that she liked PA-C Craft, but quit her job in an emotional episode. (Tr. at 435). During her appointment with PA-C Craft on July 14, 2017, Claimant displayed anxious, hypomanic, and swinging mood and reported variable energy, but she demonstrated appropriate speech, affect, and thought content; fair insight/judgment and memory; baseline cognitive functioning; and normal stream of thought. (Tr. at 376-77). She was fully oriented and cooperative, interacted well, and maintained direct eye contact with PA-C Craft. (Tr. at 377). Claimant followed up with Kelsey Miller, PA-C, on July 27, 2017. PA-C Miller stated that Claimant was stable and her symptoms were well controlled on her medication regimen of Latuda and Klonopin. (Tr. at 336). On the same date, Claimant met with Mr. Terry, who noted that Claimant's mood was brighter. She was a little hypomanic, but not sad or frightened; her sleep was fair; she had good energy, no desperation or dismay, and positive attitude; and she was looking for work. (Tr. at 439). Claimant demonstrated normal cognitive functioning, appearance, and behavior, but rapid speech, guarded attitude, impaired judgment and insight, and abnormal mood and affect. (Tr. at 438-39).

PA-C Craft noted generally the same mental status examination findings on July 28 and August 11 and 25, 2017. (Tr. at 378-83). She recorded on August 25, 2017 that Claimant was "doing better." Mr. Terry documented on August 29, 2017 that Claimant showed "huge improvement," noting that Claimant's bipolar medication stabilized her and she was beginning to regain some confidence and see things more rationally (Tr. at 443). Claimant's mental status was largely unchanged on September 8, 2017 when

compared to her preceding visits with PA-C Craft, except that her mood was only anxious and no longer hypomanic and swinging. (Tr. at 384-85). She was "doing better." (Tr. at 384).

Mr. Terry found on September 26, 2017 that Claimant was much improved, although she was under no work pressure. (Tr. at 446). Terry noted that, while he was happy that Claimant was not frantic and distraught, her family was seemingly expecting little from her and she was not having to hold down a job. (Tr. at 446). Claimant demonstrated impaired judgment and insight, psychomotor abnormalities, defensive attitude, easily distracted thought processes, and abnormal mood and congruent affect. (Tr. at 446). However, she had average intelligence, normal cognitive functioning, speech, memory, and appearance; orientation in all spheres; no perceptual disturbances; and logical and organized executive functions. (*Id.*). Claimant saw PA-C Craft the following day, and her mental status was mostly unchanged. (Tr. at 386-87). She was doing better and going to visit her sister in North Carolina for two weeks. (Tr. at 386). PA-C Craft made similar notations on October 18, 2017. (Tr. at 388-89).

However, on October 26, 2017, Claimant was again depressed. (Tr. at 449). Mr. Terry considered whether it was perhaps a seasonal issue. (*Id.*). Claimant was crying and becoming more withdrawn, but PA-C Craft still noted that Claimant was doing better during her appointment on November 9, 2017. (Tr. at 390). Her mental status findings were unchanged except she displayed depressed and anxious mood and sad affect. (Tr. at 390-91). PA-C Craft adjusted Claimant's medications. (Tr. at 391). On November 21, 2017, PA-C Craft recorded that Claimant was crying, feeling overwhelmed, displaying more OCD behaviors, but still doing better. (Tr. at 392). Her mental status findings were the same. (Tr. at 392-93). PA-C Craft resumed Claimant's medication regimen that she was

prescribed prior to the most recent adjustment. (Tr. at 393). Despite the increase, Mr. Terry noted that Claimant remained in a low or depressive mood swing on November 22, 2017. (Tr. at 452). Mr. Terry recommended that she purchase a seasonal affective disorder light. (*Id*.). Mr. Terry and PA-C Craft's findings were not significantly different on December 7, 13, 18, 20, 28, 2017 or January 9, 2018. (Tr. at 394-95, 455, 458-59, 489-94). On January 24, 2018, Mr. Terry noted that Claimant was "quite depressed," withdrawn and avoidant, and not even performing adequate self-care most days. (Tr. at 461). She was frightened when Mr. Terry mentioned possible inpatient care. (*Id*.). There were again no significant changes on January 30; February 13, 27, and 28; and March 7, 2018. (Tr. at 464, 467, 468, 495, 497-98, 499-500).

Mr. Terry recorded on March 12, 2018 that Claimant showed improvement for the first time in many months, was not in despair or acutely anxious, and she talked about working again at some point. (Tr. at 519). Mr. Terry documented the same findings of impaired judgment and insight, psychomotor abnormalities, defensive attitude, easily distracted thought processes, and abnormal mood and congruent affect. (Tr. at 518). However, Claimant displayed average intelligence, normal cognitive functioning, speech, memory, and appearance; orientation in all spheres; no perceptual disturbances; and logical and organized executive functions. (*Id*.). PA-C Craft and Mr. Terry noted the same general findings of some abnormalities, but slight improvement, on March 14, 21, and 28 and April 5, 2018. (Tr. at 501-06, 521-22). On April 9, 2018, Mr. Terry stated that Claimant was not as stable and positive as her last visit, although her mental status findings were not significantly different. (Tr. at 524). PA-C Craft recorded on April 19, 2018 that Claimant was very sensitive to bad news, still did not feel "right," felt hopeless and worried excessively, was off task easily, and had feelings of dread. (Tr. at 507). Her

mental status findings were relatively unchanged on April 19, 24, and 27; May 8, 14; June 4, 8, and 25; August 9, 14, and 23; September 14 and 26; October 24; November 9; December 11 and 27, 2018 and January 1, 8, and 24; February 13 and 14; March 20; April 11 and 17; May 9; June 6 and 19; July 18; August 6; September 24 and 27; and October 23, 2019. (Tr. at 507-09, 511-14, 527, 530, 533, 536, 539, 542, 548-49, 551-52, 602-03, 605-06, 608-09, 611-12, 618, 620-25, 627-28, 732-33, 735-36, 739-40, 742-54, 762-63, 765-66).

On October 31, 2019, Claimant followed up with PA-C Linkous, formerly named PA-C Craft. She was doing fair with some seasonal depression, but her mental status examination findings were "grossly normal." (Tr. at 614-15). Claimant was alert, pleasant, cooperative, engaged, and oriented in all spheres. (Tr. at 615). She exhibited normal hygiene, grooming, weight, speech, and fund of knowledge; fair insight and judgment; linear and goal-directed thought processes; no loosening of associations; intact memory and attention; verbal fluency; auditory comprehension; average intelligence; "okay" mood; and no abnormal thought content or ideation. (*Id*.).

However, on December 11, 2019 and January 8, 2020, all of Claimant's mental status examination findings were abnormal except for her normal cognitive functioning, intelligence, judgment, and appearance (Tr. at 756-57, 759-60). Mr. Terry noted that Claimant was battling the same issues that seem intractable to treatment. (Tr. at 760). Her personality varied between obsession and avoidance, but she was also incredibly concrete in her thinking making it hard to develop insight in therapy. (*Id*.).

### B. Opinions and Prior Administrative Findings

On April 27, 2018, state agency psychologist Rosemary L. Smith, Psy.D., assessed Claimant's mental RFC based upon her review of Claimant's records. She concluded that

Claimant could carry out two and three step commands and maintain attention for extended periods of two-hour segments, sustain tasks within a reasonable schedule that allows for brief periods of disruption in attendance and tardiness related to her symptoms, and work in situations that did not require strict production quotas. (Tr. at 72). Jeff Harlow, Ph.D., affirmed Dr. Smith's findings on July 24, 2018. (Tr. at 86).

On January 7, 2019, PA-C Linkous completed a mental impairment questionnaire that was co-signed by Alina Vrinceanu-Hamm, M.D. She opined that Claimant would be absent from work an average of more than four days per month due to "her impairments or treatment." (Tr. at 557-58). She assessed that Claimant had an unlimited or very good ability to adhere to standards of neatness and cleanliness;  limited but satisfactory ability to remember work-like procedures, understand and carry out very short and simple instructions, and be aware of normal hazards and take appropriate precautions; and a seriously limited but not precluded ability to perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, understand, remember, and carry out detailed instructions, set realistic goals and make plans independently of others. (Tr. at 554-56). However, PA-C Linkous opined that Claimant was unable to meet competitive standards in the remaining ten categories of mental abilities and aptitudes needed to do unskilled work, including paying attention for two hour segments, maintaining attendance, sustaining an ordinary routine without special supervision, responding to changes, working around others without being distracted, making simple work-related decisions, completing a normal workday and workweek without interruption from psychologically-based symptoms, accepting instructions and criticism, getting along with others, responding to changes in the work setting, and dealing with work stress. (*Id.*). PA-C Linkous noted that Claimant was overly

14

sensitive to critiques, unable to manage normal daily stressors, and overwhelmed easily. (Tr. at 555).

On March 8, 2019, Mr. Terry completed a mental impairment questionnaire, and he likewise indicated that Claimant would be absent from work an average of more than four days per month due to her impairments or treatment. (Tr. at 563-64). He opined that Claimant had no useful ability to function in terms of completing a normal workday and workweek without interruption from psychologically based symptoms, accepting instructions and respond appropriately to criticism from supervisors, getting along with others without behavioral extremes, responding appropriately to changes in the routine work setting, and dealing with work stress. (Tr. at 560-61). Mr. Terry also noted that Claimant had three repeated episodes of decompensation within 12 month period of at least two weeks duration. (Tr. at 563). Mr. Terry affirmed his RFC assessment on November 25, 2019. (Tr. at 630). He stated that he saw no substantial consistent improvement in Claimant's conditions that would allow for gainful employment, and she functioned very marginally. (Tr. at 630).

### C. Claimant's Testimony

Claimant testified during her administrative hearing on January 22, 2020 that she used to attend counseling sessions on almost a weekly basis, she now had two medical appointments per month, generally consisting of a 30-minute counseling session and a separate medication management appointment. (Tr. at 47, 54); *see also* (Tr. at 41). She stated that she mostly interacted only with her family, her predominant mood was anxiety and depression, and it was difficult for her to get motivated. (Tr. at 48-49). She lived with her father; visited her sister's house; performed housework, although her obsessive compulsive behaviors slowed her down during some tasks; and did her own laundry and

15

grocery shopping once per month (Tr. at 47, 49-50). Claimant testified that medicine helped her mood and she rarely had panic attacks anymore, but she still had problems, such as difficulty concentrating. (Tr. at 51, 52). Claimant noted that her concentration issues interfered with her last three jobs. (Tr. at 53)

### D. VE's Testimony

The VE testified in response to Claimant's counsel's question during the administrative hearing that employers tolerated one absence per month in unskilled jobs, and the jobs of garment sorter, bus cleaner, and laundry worker that the VE identified were all unskilled positions. (Tr. at 61).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Claimant contends that the ALJ failed to consider whether she would be absent from work in excess of employers' tolerances and improperly evaluated the opinions of her treating providers. Her challenges concern the ALJ's RFC finding and the ALJ's reliance on VE testimony to conclude that Claimant could perform other work at step five of the sequential evaluation.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR

§ 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

If the ALJ finds that the claimant's RFC precludes the performance of his or her past work, the ALJ must determine whether sufficient other work exists for the claimant in the national economy. The ALJ primarily relies on the DOT and "may also use a [VE]

to address complex aspects of the employment determination, including the expert's observations of what a particular job requires in practice or the availability of given positions in the national economy." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (citing SSR 00–4p, 2000 WL 1898704, at *2). Pursuant to SSR 00-4p, an ALJ must inquire on the record whether the VE's testimony conflicts with the DOT and the ALJ must identify and elicit a reasonable explanation for and resolve conflicts between the VE's testimony and the DOT before relying on the VE's testimony as evidence to support a decision regarding whether the claimant is disabled. *Id.*; *see also Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019), *as amended* (Feb. 22, 2019); *Lawrence v. Saul,* 941 F.3d 140, 143 (4th Cir. 2019).

### A. Absenteeism

Claimant argues that the ALJ did not address absenteeism despite evidence that Claimant averaged 3.25 medical appointments per month during the relevant period; her providers opined that she would miss more than four days of work per month due to her impairments or treatment; the VE testified that employers tolerated no more than one absence per month in unskilled jobs; and the ALJ found that Claimant could only perform unskilled work. (ECF No. 15 at 4-10).

In this case, the ALJ considered Claimant's inpatient mental health treatment in June 2016 and summarized her subsequent appointments with a psychotherapist, psychiatrist, and primary care provider during the relevant period. (Tr. at 22-23). The ALJ also evaluated the opinion evidence, noting that he was persuaded by the state agency psychologists' assessments that Claimant had moderate mental functional limitations because the ALJ found that the assessments were consistent with the medical evidence. (Tr. at 24). The ALJ discussed that although Claimant's mental status examination

findings were sometimes abnormal in certain domains, her providers recorded normal findings in those domains during other examinations. (*Id.*). The ALJ found that the variation between normal and abnormal findings reflected that Claimant had no more than moderate mental functional limitations. (Tr. at 24).

The ALJ next acknowledged that Claimant's treating providers, Dr. Vrinceanu-Hamm and PA-C Linkous, as well as Mr. Terry, completed mental impairment questionnaires in which they supplied opinions as to the level of impairment Claimant suffered in completing various work-related activities. The ALJ documented the opinions in his decision, including the statements that Claimant would be absent from work more than four days per month as a result of her impairments or treatment. (Tr. at 25, 27). The ALJ found that the opinions were not persuasive because they were not consistent with or supported by the medical records. (Tr. at 26, 27-28). Specifically, the ALJ indicated that Claimant did not have any episodes of decompensation that lasted at least two weeks in duration; her memory, thought processes, cognitive functioning, and affect varied between normal and abnormal; and she generally presented as alert, pleasant, cooperative, and engaged with good hygiene and grooming. (Tr. at 26, 27). However, he did not specifically comment on the opinions regarding absenteeism.

As a threshold matter, the undersigned notes that it is a "faulty premise [to conclude] that if the record shows more than one monthly medical appointment in the past, that is prima facie evidence of absenteeism, and the burden shifts to defendant to prove that the appointments will not result in absenteeism." *Prudich v. Saul*, No. 1:20-CV-00019, 2021 WL 933864, at *3 (S.D.W. Va. Mar. 11, 2021) (J. Faber). As the Court recently explained in *Prudich*, "[e]quating medical appointments in the past with absenteeism is a mistake; the claimant has the burden to establish that medical

appointments necessary for treatment in the future will result in absenteeism." *Id*. However, the Court clearly recognized in *Prudich* that a claimant can potentially establish future absenteeism by offering a medical opinion. *Id*. at *4. In fact, the Court specifically noted that medical opinions are very helpful in that regard. *Id*.

The record in this matter included opinion evidence and prior administrative findings concerning Claimant's absenteeism, but the ALJ did not articulate *any* assessment of that evidence. Claimant offered opinions from Dr. Vrinceanu-Hamm, PA-C Linkous, and Mr. Terry stating that Claimant would miss more than four days of work per month on average due to her impairments or treatment, (Tr. at 557-58, 563-64), yet the ALJ failed to address the issue of absenteeism. In addition, the state agency psychologists' prior administrative findings, which the ALJ purportedly found persuasive, concluded that Claimant required a schedule that allowed for "brief periods of disruption in attendance and tardiness related to her symptoms." (Tr. at 72, 86). Again, the ALJ made no mention of how those particular findings were considered in the disability determination. Claimant's attorney elicited testimony from the VE that having more than one absence per month, or being more than 10% off task, would preclude gainful employment in the unskilled occupations identified by the VE, (Tr. at 61-62); however, the ALJ never reconciled this testimony with the opinions regarding absenteeism when making his finding that Claimant could perform unskilled occupations.

Despite the evidence, the ALJ did not provide any meaningful analysis of Claimant's potential for absenteeism and how that would affect her ability to do the jobs identified by the VE. Clearly, the ALJ considered the opinions and prior administrative findings in general, but he did not articulate an assessment of the evidence concerning absenteeism. Given the lack of explanation, it is impossible to discern—without

improperly speculating and inserting *post hoc* rationale for the ALJ—whether the ALJ even considered absenteeism or tardiness as a potential limitation to Claimant's ability to work.

Moreover, the ALJ's error cannot be considered harmless in light of the VE's testimony that even two absences per month would eliminate the unskilled jobs that the ALJ determined Claimant could perform. The Commissioner cites several cases to indicate that regularly scheduled appointments for maintenance of chronic conditions can generally be planned to accommodate a work schedule and do not inherently result in excessive absenteeism. (ECF No. 16 at 12). However, in those cases, the claimants attempted to establish absenteeism solely based on medical history, and the cases do not indicate that there were opinions or prior administrative findings in the record concluding that the claimants would be absent from work. *Bailey v. Berryhill*, No. 3:17-CV-01365, 2018 WL 2091358, at *23 (S.D.W. Va. Apr. 10, 2018), *report and recommendation adopted*, 2018 WL 2090479 (S.D.W. Va. May 4, 2018); *Clay v. Berryhill*, No. 2:18-CV-00260, 2018 WL 4782273, at *7–8 (S.D.W. Va. July 2, 2018), *report and recommendation adopted,* 2018 WL 4781188 (S.D.W. Va. Oct. 3, 2018); *Prudich*, 2021 WL 933864, at *4-5.

As Claimant emphasizes in her reply, the distinguishing factor in this matter is that she offered additional evidence of absenteeism from her providers, bolstered by the state agency's prior administrative findings, and the ALJ failed to address any of it. The undersigned recognizes that by the time of Claimant's administrative hearing in January 2020 she averaged only two medical appointments per month, and some of the appointments, specifically her counseling sessions, typically only lasted for 30 minutes. (Tr. at 47-48, 54). However, for 12 months or more during the relevant period, Claimant

averaged at least two and generally more appointments per month. The frequency of those appointments alone was insufficient to establish future absenteeism, but when combined with the prior administrative findings and opinion evidence, the ALJ should have provided his analysis of Claimant's evidence on absenteeism and determined whether she was unable to work for some period after her alleged onset date because of her impairments or treatment.

Furthermore, the treating sources indicated that, apart from her treatment schedule, Claimant's mental health impairments alone could hinder her presence at work and on the job. According to Mr. Terry, Claimant tended to "decompensate rapidly," causing her to attempt to avoid life and making her unable to face any pressure, stress, adversity, or responsibility. (Tr. at 561). Dr. Vrinceanu-Hamm and PA-C Linkous found that Claimant was "unable to meet competitive standards" when it came to regularly attending work and being punctual. (Tr. at 554-55). As such, in addition to Claimant's treatment demands, the ALJ should have addressed Claimant's potential for absenteeism and tardiness due to her mental impairments.

Certainly, the ALJ might have found that Claimant did not credibly establish that she would miss work to the extent that it would preclude substantial gainful activity or that her appointments could accommodate her work schedule. However, the ALJ did not articulate those findings, and the Court cannot substitute its rationale for the ALJ. In addition, it is unclear what the state agency psychologists meant by stating that Claimant would have "brief periods of disruption in attendance and tardiness related to her symptoms." Perhaps, that limitation equated to no more than one work absence per month and fell within the scope of absences allowed in unskilled work. However, the ALJ did not provide any analysis of those portions of the prior administrative findings or even

23

indicate that he considered them. While the ALJ might have found that Claimant's treating providers' opinions regarding absenteeism were unsupported and inconsistent with the medical evidence, the ALJ never reconciled those portions of the opinions, or explained why he did not include any RFC limitations related to work absences despite contradictory evidence in the record.

In a recent case that is currently on appeal to the Fourth Circuit, the United States District Court for the Eastern District of Virginia considered a claimant's argument that the ALJ failed to address absenteeism, although her treating provider checked a box on a questionnaire regarding the average days of work per month that the claimant would be absent due to her impairments or treatment. *Faith D. v. Kijakazi*, No. 3:20-CV-334, 2021 WL 4316110, at *3 (E.D. Va. Sept. 22, 2021). The District Court concluded that because the ALJ explained why he found the medical opinion non-persuasive, incorporated the claimant's medical history into the reasoning, and "was not required to assume potential future absences based on the record of mostly scheduled, non-emergency medical appointments, the ALJ satisfied the requirement that she 'build an accurate and logical bridge' from the evidence to her conclusions in the RFC." *Id*. at *4.

To the extent that the reasoning in *Faith* is considered on appeal and upheld by the Fourth Circuit, the fact pattern is distinguishable from the instant matter. In *Faith*, the ALJ noted that the provider did not support his opinion that the claimant would be absent from work more than twice per month, although the questionnaire prompted him to explain his opinion. *Id*. at *3. Here, the ALJ did not articulate any such reasoning, and the Court cannot assume that reasoning even if an independent review of the opinions supports it. Moreover, *Faith* is distinguishable because there is no indication that the record in *Faith* included prior administrative findings that the claimant would have brief

24

periods of disruption in attendance and tardiness related to her symptoms. *Id.* (stating that the only evidence to support potential absenteeism was the treating doctor's opinions and evidence of past medical appointments). Conversely, in this case, the ALJ found that the prior administrative findings were persuasive, but never acknowledged or reconciled the portion of the findings relating to absenteeism.

Claimant's mental health appointments were scheduled, yet very frequent, for 12 months or more after her alleged onset of disability. Her treatment did not rise to the level of emergency room visits, hospital admissions, or bi-weekly infusions like courts have considered in other challenges regarding absenteeism. Still, the record in this matter was not so devoid of evidence to overlook the issue of absenteeism entirely. The opinions and prior administrative findings concerning Claimant's potential absenteeism, considered along with the VE's testimony that anything more than one absence per month would preclude employment, necessitated explanation. *See, e.g., Janel G. v. Kijakazi*, No. 5:20-CV-00018, 2021 WL 3076407, at *10 n.10 (W.D. Va. July 21, 2021) ("Janel's treating neurologist opined that Janel would likely be absent from work about twice a month because of migraines. If credited by the ALJ, this would conflict with the VE's testimony that Janel would not be able to sustain full-time employment if she were absent from work more than one day per month. Thus, on remand, the Commissioner should re-evaluate Janel's treating neurologist's opinion and determine whether her migraines warrant additional RFC limitations.") (citations omitted); *Dimailig v. Saul*, No. 119CV441LMBJFA, 2020 WL 6749856, at *11–12 (E.D. Va. Nov. 17, 2020) ("Significantly, all but five of plaintiff's doctor's visits over this period occurred on weekdays and presumably required her to miss work. Yet the ALJ's discussion of an absenteeism limitation was sparse," and despite VE testimony that two absences per month would

preclude employment, "the ALJ did not adequately consider an absenteeism limitation, despite its clear relevance given plaintiff's medical history. More specifically, he failed to include that limitation in his hypothetical questions to the vocational expert. Accordingly, the ALJ's conclusion that an absenteeism limitation was not warranted should also be revisited on remand.").

The ALJ failed to explain how the pertinent evidence regarding absenteeism is reconcilable with the VE's testimony regarding tolerated absences in a manner that allows the Court to determine whether the ALJ's decision is supported by substantial evidence. "To undertake this analysis in the first instance would usurp the ALJ's role as fact finder." *Shoemaker v. Saul*, No. 1:19CV441, 2020 WL 5117992, at *6 (M.D.N.C. Aug. 31, 2020) (citations omitted). For those reasons, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon the RFC and step five findings regarding absenteeism.

### B. Treating Opinions

Claimant further argues that the ALJ failed to properly evaluate the opinions of her treating medical providers. (ECF No. 15 at 10-16). As explained above, the RFC finding is not supported by substantial evidence. Claimant's challenge concerning the ALJ's consideration of the opinion evidence is intertwined with her challenge concerning absenteeism because her providers opined that she would be absent from work. *Christian v. Saul*, No. CV 1:20-00051, 2021 WL 1170012, at *5 n.* (S.D.W. Va. Mar. 26, 2021). As stated, the ALJ should reconsider the opinion evidence concerning absenteeism on remand.

However, the undersigned notes that Claimant does not assert any other fatal flaws in the ALJ's evaluation of the opinions. Claimant's application was filed in November 2017. Thus, the revised regulation regarding opinion evidence, which applies to claims filed on or after March 27, 2017, governs Claimant's application. Under the revised regulation, the ALJ must evaluate the persuasiveness of all medical opinions, which are defined as the following:

> [A] statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 404.1520c.

The regulatory factors that the ALJ must consider when evaluating medical opinions include supportability; consistency; relationship of the source to the claimant; length, purpose, and extent of treatment relationship; frequency of examinations; whether the source examined the claimant; the source's specialization; and other factors. *Id.* at § 404.1520c(c). The supportability and consistency of the opinions are of primary importance. The ALJ must articulate his or her consideration of the factors of supportability and consistency, but the ALJ is not required to explain how he or she considered the other regulatory factors. *Id.* at § 404.1520c(b)(2).

The term "supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his

or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(1). Furthermore, the law explains that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s)" are. *Id*. at § 404.1520c(c)(2).

Although Claimant may disagree with the ALJ's findings that the opinions from her providers were not persuasive, she does not identify any other error in the RFC analysis that warrants remand. Claimant simply asks the Court to review the record and reach different conclusions than the ALJ. She does not assert that the ALJ overlooked critical evidence. As discussed in the preceding section, the ALJ considered the opinions from Claimant's providers, but found that they were not consistent with or supported by the medical records. (Tr. at 25-28). The ALJ explained that Claimant did not have any episodes of decompensation that lasted at least two weeks in duration; her memory, thought processes, cognitive functioning, and affect varied between normal and abnormal; and she generally presented as alert, pleasant, cooperative, and engaged with good hygiene and grooming. (Tr. at 26, 27). The ALJ was not required to afford any evidentiary weight to the opinions under the new regulatory framework, and he adequately explained why he did not find the opinions supportable or consistent with the record. Contrary to Claimant's assertion, the ALJ was not required to articulate consideration of other factors such as the treating sources' relationship to Claimant. (ECF No. 15 at 13-14). 20 C.F.R. § 404.1520c(b)(2). Claimant argues that the ALJ cherrypicked facts and provided extraneous reasons to discredit the treating opinions, but the analysis complied with the law and there is more than a scintilla of evidence to support it. Claimant

clearly had mental symptoms and abnormal findings, but she also functioned normally in the same areas during other appointments. There is more than a scintilla of evidence to support the ALJ's assessment that the extreme limitations assessed by Claimant's providers are not persuasive.

For those reasons, the undersigned **FINDS** that the ALJ should reevaluate and explicitly address the evidence regarding absenteeism on remand, but the ALJ's consideration of the opinion evidence is otherwise supported by substantial evidence.

## VIII. <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion to the extent that it requests remand of the Commissioner's decision, (ECF No. 15); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 29, 2021

Cheryl A. Eifert
United States Magistrate Judge